**KUX MANUFACTURING COMPANY, Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

Nos. 88–6309, 89–5430.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 3, 1989.

Decided Oct. 6, 1989.

Ann L. VanderLaan, Steven J. Fishman (argued), Bloomfield Hills, Mich., for petitioner, cross-respondent.

Aileen A. Armstrong, Associate Gen. Counsel, Judith A. Dowd, Barbara Sapin (argued), N.L.R.B., Office of the General Counsel, Washington, D.C., Bernard Gottfried, Regional Director, Dennis R. Boren, N.L.R.B., Detroit, Mich., for respondent, cross deputy-petitioner.

Before MARTIN and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.

MILBURN, Circuit Judge.

Kux Manufacturing Company ("the Company"), a Michigan corporation, petitions this court for review of a National Labor Relations Board order finding that it refused to bargain with the United Steelworkers ("the Union") as the certified bargaining representative of its employees, in violation of section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5). The Company admits that it has refused to bargain with the Union, but insists that the Union was improperly certified by the Board. For the reasons that follow, we deny the Company's petition and enforce the Board's order.

I.

A.

On April 25, 1986, the Union filed a representation petition with the Board, seeking certification as the collective bargaining representative of the Company's production and maintenance employees. In an election the Board conducted on June 25, 1986, a total of 210 votes were cast, 113 for and 97 against the Union. The Union challenged three ballots, a number insufficient to affect the results of the election.

The Company filed objections to the election, claiming that the Union, through threats, bribes, and coercion, created an atmosphere of fear and intimidation which prevented a free and fair election. On July 18, 1986, the Board's regional director is-

sued a Report and Recommendations on the Company's objections, recommending that several of them be overruled, but that a hearing be held on five objections:

*Objection 1(a):* The Union threatened and coerced employees with reprisals if they did not vote for it at the election;

*Objection 1(c):* The Union polled and interrogated employees regarding how they would vote in the election;

*Objection 1(d):* The Union circulated a list of employees who did not support it in the election;

*Objection 5:* The Union offered and/or delivered cash payments, benefits, and entertainment to influence employees' votes; and

*Objection 6:* The Union engaged in active campaigning at or near the polling area prior to and during the election.

A hearing on the Company's election objections was conducted over nine days in February 1987. On April 24, 1987, the hearing officer recommended that the Company's election objections be overruled and that the Union be certified as the employees' bargaining representative. On April 8, 1988, the Board adopted the hearing officer's findings and certified the Union as the employees' bargaining representative.

By letter dated May 3, 1988, the Union requested that the Company furnish it with information concerning the employees' wages and employment. By letter dated May 18, 1988, the Company refused to furnish the requested information and further stated that it did not accept the Union as the employees' bargaining representative.

The Union filed a refusal to bargain charge against the Company on June 6, 1988, and on June 29, 1988, the General Counsel issued a complaint alleging that the Company's actions constituted an unfair labor practice. In its answer, the Company admitted that it had refused to bargain with the Union, but denied that the Union was properly certified, and set forth affirmative defenses relating to the certification election.

On August 5, 1988, the General Counsel filed a motion for summary judgment with the Board. On August 10, 1988, the Board transferred the matter to itself and issued a Notice to Show Cause why the General Counsel's motion for summary judgment should not be granted. The Company filed a response to the notice which essentially repeated the defenses it had previously raised.

On October 20, 1988, the Board issued a Decision and Order granting the General Counsel's motion for summary judgment. The Board found that all the issues raised by the Company were or could have been litigated in the prior representation proceeding and that the Company did not offer to adduce at a hearing any newly discovered or previously unavailable evidence, nor did it allege any special circumstances that would require the Board to re-examine the decision to certify the Union as the employees' bargaining representative. The Board ordered the Company to cease and desist from: (1) refusing to bargain with the Union, (2) refusing to provide the Union with relevant information, and (3) interfering with employees in the exercise of their section VII rights. This timely appeal followed.

As the claimed unfair labor practice is alleged to have occurred in Detroit, Michigan, this court has jurisdiction over the proceeding pursuant to section 10(e) and (f) of the National Labor Relations Act (29 U.S.C. § 160(e) and (f)).

### B.

Union organizer Bondie Rowell began meeting with Company employees in March 1986. Rowell had employees form an In-Plant Organizing Committee ("IPOC" or "Committee") for the purpose of soliciting Union authorization cards and persuading employees to vote for the Union. Eight employees served on the IPOC, including Denise Beno and Sandra Perryman. Committee members solicited support for the Union at work and attended organizational meetings, where they assisted Rowell in answering employee questions. Rowell also told employees that if they could not reach him, they should contact Beno.

During the election campaign, the Union held a series of meetings with employees at the Rams' Horn restaurant, which was approximately one mile from the plant. These meetings occurred on April 19, May 17, June 5, June 17, and June 24, 1986. At these meetings, the Union paid for the employees' food and drink. Rowell informed the employees that the Union limited its support to $2.50 per employee per meeting, but when employees exceeded that limit, as they often did, he covered the difference himself and the Union reimbursed him. The Union eventually reimbursed Rowell approximately $600.00. Neither the Union nor Rowell ever purchased alcoholic beverages for any employees.

Several employees testified that in the weeks preceding the election, they heard rumors that employees who did not support the Union would lose their jobs if the Union won the election. Other employees testified that in the Company annex, a building next to the main plant where approximately 20 employees work, employee Lester Henry threatened that employees who did not vote for the Union would be "terminated" or "they'd get their ears [or other body parts] beat."

Approximately 20 to 25 employees attended the June 17 meeting. Beno sat at the head table with Rowell, who polled the employees and asked them how they planned to vote. After approximately 20 employees were polled, some objected to the question. Rowell then changed the polling to ask only if the employees present were eligible to vote.

During the meeting, IPOC member Sandra Perryman passed a piece of paper to employee Sharon Atkins which listed eight employees, including Atkins. Perryman characterized the paper as a "hit list" of anti-Union employees who would be terminated if the Union won the election. Also during the meeting, employee Mike Berzkalns questioned Rowell at length about the Union. When Berzkalns stated that the employees did not need the Union, Beno shouted, "You'll get yours when the Union gets in." Berzkalns left the meeting immediately.

On June 24, 1986, the day before the election, the Union held a final meeting with approximately 35 to 40 employees. Berzkalns was again in attendance and was again the target of hostility from Union supporters. Berzkalns got into another heated exchange with Rowell and Beno, and when Berzkalns walked out, Beno shouted that "he's one of the guys we're gonna have to take care of when we get voted in." Several employees testified that Rowell nodded his head and said, "Exactly."

Voting took place on election day between 5:30 a.m. and 6:30 a.m. and 1:00 p.m. to 4:00 p.m. on June 25, 1986, in the Company cafeteria. During the afternoon voting session, a group of approximately ten employees left the annex together to vote. Several employees known to be against the Union were in the group. As they left the annex, Lester Henry yelled that he would pay them $50.00 to vote for the Union. These employees testified that they asked if he meant a one-time payment or $50.00 per week. They testified Henry replied he meant per week, if they could prove how they voted in the secret election.

Henry continued his pro-Union electioneering in the polling area. While in the cafeteria waiting to vote in the afternoon, he yelled two or three times that it was the employees' last chance to change their minds and vote for the Union. Approximately 20 eligible voters were in line at the time Henry yelled his comments. Henry was so loud that the NLRB representative conducting the election told him to be quiet or leave; he quieted down. In addition, Rowell testified that a computer operator who was not eligible to vote in the election went into the polling area during the election and yelled "Vote Yes."

Sharon Atkins testified that when she went to vote at the beginning of the afternoon session, she observed the words "Vote Yes" scribbled in pencil on the voting booth platform. The words "Vote Yes" were visible from outside the voting booth, and remained there for an indeterminate amount of time.

Cynthia Collins was the Union's morning election observer; Clayton Bard was the afternoon observer. Both employees were paid for normal work hours during the time they observed the election. In addition, the Union paid Bard $23.40 for his time, while it did not pay Collins anything.

The Company blames the Union for two pre-election incidents of automobile vandalism and for the injury employee Lori De-Priest suffered when she attempted to punch her time card two days after the election. Company officials discovered that a drill bit had been positioned in the time card rack in such a way that it would cut DePriest when she reached for her card. DePriest and employee Phil Tokarski blamed Lester Henry for the incidents, as they worked with him in the annex, and he had threatened employees who would not support the Union.

The Company defends its refusal to bargain with the Union on the ground that the Union was improperly certified as the employees' bargaining representative. Accordingly, the principal issue on appeal is whether there is substantial evidence in the record to support the Board's decision to overrule the Company's election objections and find it guilty of unfair labor practices.

## II.

The scope of our review of Board findings is well-established: Where there is substantial evidence in the record as a whole to support the Board's conclusions, they may not be disturbed upon appeal. 29 U.S.C. § 160(e), (f); *John M. Horn Lumber Co. v. NLRB*, 859 F.2d 1242, 1243 (6th Cir.1988); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Moreover, "it is the Board's function to resolve questions of fact and credibility where there is a conflict in the testimony." *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir.1984) (per curiam).

"[B]allots cast under the safeguards provided by Board procedure [presumptively] reflect the true desires of the participating employees." *NLRB v. Zelrich Co.*, 344 F.2d 1011, 1015 (5th Cir.1965). Thus, the burden of proof on parties seeking to have a Board-supervised election set aside is a "heavy one." *Harlan #4 Coal Co. v. NLRB*, 490 F.2d 117, 120 (6th Cir.), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974); *see also NLRB v. First Union Management, Inc.*, 777 F.2d 330, 336 (6th Cir.1985) (per curiam). This burden is not met by proof of misconduct, but "[r]ather, specific evidence is required, showing not only that unlawful acts occurred, but also that they interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." *NLRB v. Bostik Div., USM Corp.*, 517 F.2d 971, 975 (6th Cir.1975) (quoting *NLRB v. White Knight Mfg. Co.*, 474 F.2d 1064, 1067 (5th Cir.1973)).

## III.

### A.

■ In his motion for summary judgment, the General Counsel argued that the Company should not be permitted to test the validity of the certification election in an unfair labor practice proceeding. He argued that if the Company did not agree with the Board's dismissal of its challenge to the election, it should have appealed the dismissal, instead of raising the validity of the election as an affirmative defense in this unfair labor practice proceeding. The Company's failure to appeal the election, however, does not prevent this court from considering its challenge to it in this unfair labor practice proceeding. *See John M. Horn Lumber Co. v. NLRB*, 859 F.2d 1242 (6th Cir.1988).

### B.

#### 1.

■ In Objection 1(a), the Company argues that the Union threatened employees with reprisals if they did not vote for the Union or abstain from voting. In support of this contention, the Company insists that the Union is responsible for the alleged threats made by members of the In–Plant

Organizing Committee, because they were agents of the Union.

In its decision certifying the election of the Union, the Board agreed with the ALJ that the IPOC members were not Union agents. We agree. "Generally, a union is not responsible for the acts of an employee, unless the employee is an agent of the union." *Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351, 355 (6th Cir.1983). The conduct of pro-union employees will only be attributed to a union where the union has "instigated, authorized, solicited, ratified, condoned or adopted" the conduct. *Id.* "The test of agency in [a] union election context is stringent, involving a demonstration that the *union* placed the employee in a position where he appears to act as its representative; it is not enough that the employee unilaterally claims representative status." *Tuf-Flex Glass v. NLRB*, 715 F.2d 291, 296 (7th Cir.1983) (emphasis in original) (citation omitted).

In this case, the evidence shows that Rowell, the Union's paid organizer, conducted and coordinated the Union's campaign. Membership in the IPOC was open to all interested employees, and its sole function was to distribute information and solicit authorization cards. We believe that the Board had substantial evidence to conclude that the IPOC members had so few responsibilities and such limited authority that they could not be mistaken for agents. *See Certain–Teed Prod. Corp. v. NLRB*, 562 F.2d 500, 509–10 (7th Cir.1977).

In arguing that the employees were Union agents, the Company relies upon *PPG Industries, Inc. v. NLRB*, 671 F.2d 817 (4th Cir.1982) and *NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239 (4th Cir.1976). The Company's reliance is misplaced because in the very fact-specific issue of agency, the facts in this case simply do not compare to those in *PPG Industries* and *Georgetown Dress*. In those cases, the IPOC members visited the homes of fellow employees, were held out as union spokesmen, and were otherwise given substantially greater responsibilities by their unions than the IPOC members in this case.

The Company argues that employee Lester Henry, who was not an IPOC member, was also an agent of the Union. The Company argues that Henry was such an active and vocal Union supporter that he reached a status equal to that of IPOC members. There is no evidence, however, that Rowell ever authorized Henry to speak on behalf of the Union, that he endorsed any of Henry's statements or that he even knew that Henry was making them. Moreover, the fact that Henry, not an IPOC member, distributed Union information and solicited Union authorization cards supports the finding that IPOC members were not agents, because all employees were free to encourage other employees to attend the meetings and to help distribute Union literature. Evidence which merely shows that an employee spoke and acted in support of unionization on his own initiative does not demonstrate agency status. *See Tuf-Flex Glass*, 715 F.2d at 296.

### 2.

■ The Company next argues that even if the employees in question were not agents of the Union, the threats they allegedly uttered and the misconduct they allegedly perpetrated created an atmosphere of fear and reprisal sufficient to invalidate the election. We agree with the Board that the alleged threats and misconduct did not taint the entire election. *See NLRB v. Griffith Oldsmobile, Inc.*, 455 F.2d 867, 870 (8th Cir.1972) (quoting *Manning, Maxwell & Moore v. NLRB*, 324 F.2d 857, 858 (5th Cir.1963)).

The cases upon which the Union relies, *John M. Horn Lumber Co. v. NLRB*, 859 F.2d 1242 (6th Cir.1988), and *Hickman Harbor Servs. v. NLRB*, 739 F.2d 214 (6th Cir.1984), demonstrate that the Board's decision to certify the election in this case is supported by substantial evidence. In both of those cases, the number of voting employees was relatively small and the Union prevailed in very close balloting. Additionally, in both cases, Union supporters made very specific and serious threats of bodily harm against employees who did not support the Union, and in both cases, these threats were accompanied by actual physi-

cal assault. In this case, however, the number of voting employees was comparatively large, the alleged threats were nowhere near as specific as in *John M. Horn Lumber Co.* and *Hickman Harbor Servs.*, and they were not accompanied by physical violence.

## C.

The Company argues in Objection 1(c) that the Union interrogated employees regarding how they would vote, thereby intimidating them and invalidating the election. It is uncontested that Rowell polled employees at the June 17 meeting, but stopped after employees complained that they did not want to publicly announce how they intended to vote. He then continued to poll the employees, but asked only if they were eligible to vote in the election. The Board found this conduct was not objectionable, and we agree. A non-coercive pre-election poll does not constitute objectionable conduct. *See Kusan Mfg. Co. v. NLRB*, 749 F.2d 362, 364–65 (6th Cir.1984) (per curiam).

In Objection 1(d), the Company argues that the Union circulated a "hit list" of employees who would be terminated for failure to support it in the election. The Company insists that the circulation of the list at the same meeting in which the employees were polled tainted the election held a week later. However, as the Board found, there is no evidence that the Union compiled the list or even knew of its existence. We agree with the Board that the list, considered alone or in conjunction with the polling, was not so inherently coercive as to create an atmosphere of fear and reprisal or otherwise taint the election held a week later.

In Objection 5, the Company argues that the Union influenced employees' voting by offering and/or providing cash payments and excessive entertainment. Its arguments, however, are completely without merit. First, supplying food and soft drinks is commonplace in American elections and is not the equivalent of buying votes, *see Sonicraft, Inc.*, 276 NLRB 407, 413 (1985), and there is no evidence in the record that the food and soft drinks supplied in this case were so exorbitant as to amount to bribes.

Second, payments by unions to employees who act as election observers are permissible as long as the payments are reasonable. *Heavenly Valley Ski Area v. NLRB*, 552 F.2d 269, 272 n. 1 (9th Cir.1977) (per curiam). In this case, the Union paid Bard $24.00 based upon his hourly wage, and there is no evidence that Collins would not have been similarly compensated had she requested it.

Third, the record does not support the Company's contention that Lester Henry's joking offer of $50 per vote per week constituted a serious offer of a bribe. Employee Mildred Semeniuk testified that Henry laughed out loud as he yelled his offer to well-known union opponents, and, in any case, Henry was not an agent whose conduct can be imputed to the Union.

In Objection 6, the Company argues that the Union engaged in impermissible electioneering in the polling area. This objection is also without merit, as there is no evidence that the alleged conduct disrupted the voting procedure in any way or otherwise destroyed the atmosphere necessary for the exercise of free choice. *See Kitchen Fresh, Inc.*, 716 F.2d at 359.

## D.

The Company also argues that the hearing officer ignored or improperly discredited portions of testimony. As this court has pointed out, "it is the Board's function to resolve questions of fact and credibility when there is a conflict in the testimony." *Baja's Place*, 733 F.2d at 421. "The decision of the Hearing Officer is entitled to considerable weight where the issue turns on the credibility of witnesses who he alone saw." *Certain–Teed Prod. Corp.*, 562 F.2d at 505.

In this case, the hearing officer credited large portions of DePriest's and Tokarski's testimony, but discredited some of their statements. The hearing officer fully explained his credibility decisions, and a re-

 

view of the record indicates they are reasonable and supported by substantial evidence. Consequently, we agree with the Board in accepting the hearing officer's credibility determinations.

■ The Company also argues that it was denied due process when the hearing officer granted the Union's motion to revoke the Company's subpoena duces tecum and when the hearing officer forced the Company to introduce evidence of alleged misconduct before he would allow it to cross-examine Union organizer Rowell. These objections are also without merit, especially in light of the Company's failure to reduce the scope of its subpoena or to demonstrate the relevance of the documents it sought. Additionally, the Company's extensive cross-examination of Rowell (over 600 pages of transcript) further demonstrates a lack of prejudice from the hearing officer's rulings. An administrative agency's disposition of a case will not be disturbed on the basis of alleged procedural irregularities unless the irregularities resulted in actual prejudice to the objecting parties' interests. *See Inland Empire Council v. Millis*, 325 U.S. 697, 709–10, 65 S.Ct. 1316, 1322–23, 89 L.Ed. 1877 (1945); *Marsden Elec. Co. v. NLRB*, 586 F.2d 8, 9 (6th Cir.1978). Assuming that the hearing officer's rulings concerning the Company's examination of Rowell were erroneous, the record viewed as a whole indicates the error was harmless.

In addition to its specified objections, the Company argues that the cumulative impact of the events described warrants setting aside the election. However, as seen above, none of its objections have any merit under established legal standards. Neither singly nor in combination could the various incidents alleged have materially affected the employees' ability to express their free choice. Thus, we find there was substantial evidence supporting the Board's decision to decline to set aside the election. *See NLRB v. Basic Wire Prod., Inc.*, 516 F.2d 261, 266 (6th Cir.1975).

## IV.

Accordingly, for the foregoing reasons, the Company's petition to set aside the order of the Board is DENIED, and the Board's petition for enforcement is GRANTED.