NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SLIMAN'S SALES & SERVICES,
INC., Respondent.

No. 01–1990.

United States Court of Appeals,
Sixth Circuit.

Sept. 17, 2003.

Fred L. Cornnell, Jr., Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Siobhan Kelly, National Labor Relations Board, Washington, DC, for Petitioner.

Alan G. Ross, Ross, Brittain & Schonberg, Cleveland, OH, for Respondent.

Before DAUGHTREY and COLE, Circuit Judges; and SARGUS, District Judge.*

SARGUS, District Judge.

Following a representation election, Petitioner, National Labor Relations Board

* The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

("NLRB" or "Board"), certified the International Association of Machinists and Aerospace Workers (the "Union") as the exclusive bargaining representative for a unit of workers employed by Respondent, Sliman's Sales and Service, Inc. ("Sliman" or the "Company"). Sliman, continuing to contest the representation election and subsequent certification, has refused to bargain with the Union. On May 24, 2001, the Board ordered the Company to cease and desist in its refusal to bargain. The Board has applied to this Court for enforcement of its decision and order. For the reasons that follow, the Board's Petition for Enforcement is granted.

### I.

Sliman sells and services automobiles and trucks at a facility located in Amherst, Ohio. On August 11, 2000, the Union filed a representation petition with the Board seeking certification as the collective-bargaining representative for a unit of full-time and regular part-time mechanics and parts department employees. On September 22, 2000, pursuant to a stipulated election agreement, the Board conducted a secret-ballot election. Of the twelve eligible employees, seven voted for the Union and five against. No ballots were challenged.

During the campaign before the election, the Union's business representative, Miguel Castro, promised eligible voters that those who supported the Union would receive hats, T-shirts and stickers for voting in favor of union representation. Castro also told three eligible voters that, if the Union won the election and the employees thereafter became dissatisfied with the Union, they could "vote the Union out as easily as we voted them in."

On the morning of the scheduled election, Sliman's service manager, James Young, went into the changing room at the facility to verify that the election notice was posted there in accordance with the Board's requirements. Tom Emery, an employee of Sliman and a supporter of the Union, was already in the room. Young saw that the election notice had been defaced. Across the portion of the election notice that displayed a sample official secret ballot, someone had written "F ---" "Yes Yes Yes." Because of the profanity and defacement, Emery pulled the notice down and threw it away as he stated to Young, "[y]ou're my witness. I'm the one who took it down if anyone asks." Young immediately reported the incident to Paul Sliman, who posted a new notice.

One hour before the election was to take place, the Board Agent met with representatives of Sliman's management, Castro, and two Sliman's employees, Matt Ferritto and Tom Byczek, to prepare for the election. During this pre-election conference, employee Jonathan Mumford saw Castro leave the cafeteria more than once. According to Mumford, who was in the parts department, Castro approached, stared at him without speaking, and flashed the back of a folder or clipboard that read: "The Best Promises Are Made in Writing."

At 11:30 a.m., just as the polls opened, Castro handed Emery a letter stating: "Written promises go further. Vote Yes." At Castro's insistence, Emery showed the letter to some of the shop employees. Emery disposed of the letter after he showed it to the other employees.

After he voted, while the polls were still open, Emery asked the Board Agent conducting the election for a list of employees who had not yet voted. The Board Agent explained that the distribution of the list was prohibited. Emery then left the cafeteria and yelled words to the effect of "Come in and vote, if you haven't voted yet."

The Company filed timely objections to the conduct of the election requesting that the election results be set aside because the Union, through its agents, engaged in improper conduct before and during the voting process. After conducting an investigation, the Regional Director of the NLRB issued a report recommending that the Union be certified because the evidence was legally insufficient to warrant a set-aside of the election. The Company filed timely exceptions to the Regional Director's report. The Board adopted the Regional Director's recommendations and issued a decision certifying the Union as exclusive collective bargaining representative of the Company's employees in the pertinent bargaining unit.

In January and February 2001, the Union requested that the Company bargain with respect to the hours, wages, and conditions of employment for the employees for which the Union was certified to represent. When the Company refused, the Union then filed an unfair labor charge alleging that the refusal to bargain violated 29 U.S.C. §§ 158(a)(5), (1).[1]

In the proceedings before the Board on the unfair labor practices charge, the Company admitted that it refused to bargain but disputed the validity of the Union's certification on the grounds of misconduct during the election. The Board granted the Union's motion for summary judgment concluding that "[b]y failing and refusing on and after January 3, 2001, to recognize and bargain with the Union as the exclusive collective-bargaining representative of the employees in the appropriate unit, [Sliman] has engaged in unfair labor practices

affecting commerce within the meaning of Section 8(a)(5) and (1) and Section 2(6) and (7) of the Act." The Board refused to review the propriety of the representation, finding that the Company did not intend to offer new evidence and, therefore, did not raise any issues that were not or could not have been litigated in the prior representation proceeding before the Board. *Sliman Sales & Service, Inc. v. Int'l Ass'n of Machinists and Aerospace Workers*, Case 8–CA–32256 (May 24, 2001). Accordingly, the Board ordered the Company to cease and desist refusing to bargain and to bargain in good faith with the Union upon request. The Company refused.

The Board now applies for enforcement of this May 24, 2001 order. This Court has jurisdiction over this proceeding pursuant to 29 U.S.C. § 160(e).

## II.

Congress has vested the NLRB with significant discretion to supervise and regulate representation elections. *Maremont Corp. v. NLRB*, 177 F.3d 573, 576 (6th Cir.1999). To ensure that employees maintain the greatest access to choice in the selection of their representatives, the NLRB is "to conduct representation elections 'in an atmosphere in which employees are free from pressure, coercion and undue influence from either the employer or the union.'" *Id.* at 577 (quoting *NLRB v. Tennessee Packers, Inc.*, 379 F.2d 172, 180 (6th Cir.1967)). The burden of demonstrating that a representation election was not conducted fairly rests with the party seeking to overturn the results. *NLRB v.*

---

1. It is an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees." 29 U.S.C. §§ 158(a)(5). Furthermore, an employer seeking a judicial determination of the propriety of an election is required to refuse to bargain with the union. The election is chal-

lenged through the unfair labor practice proceeding for refusal to bargain brought by the NLRB against the employer. *Maremont Corp. v. NLRB*, 177 F.3d 573, 576 (6th Cir.1999) (citing *NLRB v. Duriron Co.*, 978 F.2d 254, 256 n. 1 (6th Cir.1992)).

*Superior Coatings, Inc.,* 839 F.2d 1178, 1180 (6th Cir.1988). To satisfy this burden, the objecting party must demonstrate that "unlawful conduct occurred which interfered with employees' exercise of free choice to such an extent that it materially affected the results of the election." *Comcast Cablevision Taylor,* 232 F.3d 490, 494 (citing *NLRB v. Shrader's, Inc.,* 928 F.2d 194, 196 (6th Cir.1991)).

This Court reviews the Board's conclusions of law *de novo.* *NLRB v. Good Shepherd Home, Inc.,* 145 F.3d 814, 816 (6th Cir.1998). This Court reviews the Board's factual findings and application of the National Labor Relations Act ("NLRA") to the particular facts of a case under a substantial evidence standard. *Id.* The Board's findings with respect to whether an election reflected the "fair and free choice" of employees "will not be disturbed on appeal where substantial evidence in the record as a whole supports its conclusions." *NLRB v. Dickinson Press, Inc.,* 153 F.3d 282, 285 (6th Cir.1998); *Comcast Cablevision–Taylor,* 232 F.3d at 495. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

## III.

### A. Castro's Conduct

Sliman raises three objections to Castro's statements and actions and asserts that such conduct constitutes grounds for overturning the results of the September 20, 2001 representation election. First, the Company objects on the ground that, prior to the election, Castro promised employees that they would receive hats, T-shirts, and stickers for voting for the Union. Second, the Company complains that prior to the representation election Castro

improperly told employees that they would be able to vote the Union out as easily as they voted it in. Third, the Company argues that during the representation election Castro improperly showed an employee a folder that read: "Written Promises Go Further."

### 1. Promises of Gifts

Sliman argues that the election should be set aside because the Union, through Castro, improperly promised eligible voters that they would receive hats, T-shirts, hats and stickers if they voted for the Union. The Board found no evidence that Castro distributed any items during the Union's campaign. Assuming *arguendo* that hats, T-shirts, and stickers were distributed, the Board concluded that the "distribution of inexpensive pieces of campaign propaganda such as buttons, stickers, or T-shirts is not per se objectionable" and a distribution will not be considered objectionable unless it occurs "at the election site immediately after the voters left the polling area," as an obvious reward for voting in favor of union representation.

"Although the distribution of rewards or economic inducements generally constitutes objectionable conduct ... the distribution of inexpensive campaign propaganda is permissible." *Dickinson Press,* 153 F.3d at 286 (citations omitted). The Board has applied a totality of the circumstances approach considering the timing of the benefit, the number of employees to whom the benefit is granted, and the likelihood of the benefit being interpreted as an inducement to vote pro-union. *See Owens–Illinois, Inc.,* 271 NLRB 1235, 1235–36 (1984).

When examining whether a pre-election benefit conferred by a union is objectionable, the Court considers (1) whether the benefit is sufficiently valuable and desirable in the eyes of the person to whom it is

offered to have the potential to influence that person's vote; and (2) whether the benefit actually influenced the vote without relation to the merits of the election. *Comcast Cablevision–Taylor,* 232 F.3d at 495 (adopting test from *Nestle Ice Cream Co. v. NLRB,* 46 F.3d 578, 582 (6th Cir. 1995)).

### a. Value and Timing

The record contains no evidence of the precise value of the hats, T-shirts, and stickers at issue. Generally, however, T-shirts are not considered to be of significant value. *See Dickinson Press,* 153 F.3d at 286–87 (distribution of inexpensive T-shirts mere campaign propaganda and, therefore, proper). The Board has stated that "a T-shirt has no intrinsic value sufficient to necessitate our treating it differently than other types of campaign propaganda, which we do not find objectionable or coercive." *R.L. White Co.,* 262 NLRB 575, 576 (1982).

Sliman relies heavily on *NLRB v. Shrader's, Inc.,* 928 F.2d 194 (6th Cir. 1991), as support for its argument that T-shirts constitute a valuable benefit, the promise of which interferes with a representation election. While this Court did conclude in *Shrader's* that the distribution of T-shirts was improper, that conclusion was based on the totality of the circumstances and largely turned upon an analysis of *Owens–Illinois,* 271 NLRB 1235.

Using a totality of the circumstances approach in *Owens–Illinois,* the Board concluded that it was improper for a union organizer to hand out union insignia jackets valued at $16 to employees, some of whom had not yet voted, between sessions on election day. The Board noted that, given the timing of the distribution of the apparel, employees could have easily perceived the jackets as a reward for voting for the union and an inducement to those who had not yet voted. 271 NLRB 1235–36. The Board, comparing the $16 value of the jackets at issue in *Owens–Illinois,* to the $4–$5 value of the T-shirts at issue in *R.L. White,* concluded that the value of the jackets far exceeded the value of "inexpensive pieces of campaign propaganda such as buttons, stickers, or T-shirts." *Id.* at 1235. Similarly, *Shrader's* involved the distribution of hats and T-shirts throughout the day of the election to employees passing the plant entrance. 928 F.2d at 197. The *Shrader's* Court found no meaningful distinction between the hats and T-shirts and the jackets offered in *Owens–Illinois. Id.* Sliman contends that *Shrader's* created a *per se* rule that T-shirts, like jackets, are valuable. This approach, however, does not accurately reflect the holding of *Shrader's.* This Court made clear in *Shrader's* that the relevant consideration with respect to value requires an assessment of whether the articles are "sufficiently valuable and desirable in the eyes of the person to whom they are offered, to have the potential to influence that person's vote." *Id.* at 198. We noted that, "[a]lthough workers may be willing to accept campaign buttons and bumper stickers to show support for a union, those articles have little potential to 'purchase' or otherwise unduly influence a vote, especially when contrasted with attractive ball caps, T-shirts, and jackets." *Id.*

In both *Owens–Illinois* and *Shrader's,* the distributions of benefits occurred while the election was underway. In each case, the timing and the circumstances made the apparel appear to be a direct reward for casting a pro-union vote. In the present case, although the election was close, no distribution took place on election day. In fact, no pre-election distribution took place at all. Rather, Castro merely promised the items, which, as the Board determined,

was "nothing more than a legitimate form of campaign propaganda."

### b.  Potential to Influence

Sliman relies on the Supreme Court's decision in *NLRB v. Savair Manufacturing Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), in arguing that Castro's promise of T-shirts, hats and bumper stickers influenced the employees in the way they voted.  In *Savair*, the union agreed to waive its initiation fees for employees who signed union "recognition slips" showing their pre-election support. 414 U.S. at 272–73, 94 S.Ct. 495.  The Supreme Court held that the offer to waive fees interfered with the employee's free and fair choice because the use of fee waivers permitted the union to buy endorsements and falsely portrayed employee support during the election campaign. *Id.* at 277–78, 94 S.Ct. 495.  Further, the Court determined that use of the waivers interfered with free and fair choice in the election because the fee waivers made employees feel obliged to carry through with their stated intention to vote for the union even though the fee waivers were not binding. *Id.* at 278, 94 S.Ct. 495.

Here, two key factors affect the analysis regarding the potential of the gifts to influence employee voting.  First, as the Board reasonably found, the items at issue were inexpensive.  This conclusion is supported by common sense and the law.  *See R.L. White*, 262 NLRB at 576; *Dickinson Press*, 153 F.3d at 286.  Second, the issue is not the actual distribution of T-shirts and other pro-union paraphernalia prior to an election, but, rather, the promise of these gifts if the Union was victorious in the election.

Relying on the Supreme Court's reasoning in *Savair*, Sliman argues that because the value of the hats, T-shirts, and stickers was unclear, the employees might have speculated that they were valuable, which, in turn, might have influenced their votes. While the Court in *Savair* considered the fact that the employees did not know the potential union fee, this case is distinguishable.  Plainly, the value of a T-shirt, hat, or sticker is not great and no reasonable person would expect these items to be expensive.  The value of a T-shirt, hat, or sticker, unlike the value of a fee for joining a union, is likely to be both well-known and small.  In this case, there is no evidence that suggests that the value of the items in this case would be perceived as significant. Moreover, no gifts actually were given prior to the election or during the election, and the election was done by secret ballot. Castro simply made a promise to give out the T-shirts, hats and stickers if the Union won.

As explained in *Nu Skin International*, the only employees who would have an interest in obtaining these items already were pro-union employees.  *Nu Skin Int'l, Inc.*, 307 NLRB. 223, 223–24 (1992).  The Union's interest in promising T-shirts to employees in the event of a union victory is not the same as its interest in actually distributing the T-shirts to employees who would wear them as campaign paraphernalia.

Nevertheless, the key here, as the Board found, is simply that the T-shirts were not the type of benefit that courts consider an "inducement."  *See Raleigh County Comm'n on Aging, Inc.*, 331 NLRB 925 (2000) (holding employer did not engage in objectionable conduct by announcing, prior to the election, its intent to have victory dinner after the election). In this case, nothing about the promise of hats, T-shirts, and stickers would coerce or influence employees in any way.  No obligation on the part of the employees was created by Castro's promise and, because balloting was done secretly, no one who

failed to vote for the Union would be denied the promised benefit after the election.

■ Because of the limited value of the items and the inability to determine who had voted for the union, the promise of inexpensive gifts such as T-shirts, hats and stickers created no inducement to vote a certain way. Thus, substantial evidence supports the Board's conclusion that the promise of gifts in this case constituted mere campaign propaganda.

### 2. Ease of Voting Union Out

Sliman claims that Castro's comment to three voting employees that, if they became dissatisfied, they could vote the Union out "as fast as it was voted in" was an improper misrepresentation because it failed to inform the employees that a decertification election could not be held until the end of the Union's certification year. The Board determined that the comment was not objectionable but instead was "mere 'campaign propaganda' which can easily be comprehended by unit employees." In the alternative, the Board concluded that this misrepresentation was also non-material and did not constitute grounds for setting aside the election.[2]

Castro's statement that the union could be voted out quickly may not have been a misrepresentation. The essence of Castro's message was arguably accurate—employees could seek a Board-conducted decertification election if they became unhappy with the Union. *See Advertisers Mfg. Co. v. NLRB*, 677 F.2d 544, 546 (7th Cir.1982) (noting that union agent's statement that "if 'at any time' employees became dissatisfied with its performance ... 'they could vote [the union] out just like they voted it in'" was a true statement and, statement did not become a misrepresentation merely because agent did not say when decertification election could be conducted), *overruled in part on other grounds, Mosey Mfg. Co. v. NLRB*, 701 F.2d 610 (7th Cir.1983). Whether such action could be done quickly depends upon a subjective assessment of the time frame required for such a vote.

Assuming *arguendo* that Castro's statement did constitute a misrepresentation, the Court evaluates whether the Board's conclusion was based on substantial evidence. The Board applies the following standard to claims of misrepresentation in connection with representation elections:

[The Board will not] "probe into the truth or falsity of the parties' campaign statements," but [will] instead recognize and rely on employees "as mature individuals who are capable of recognizing campaign propaganda for what it is and discounting it." ... [T]he Board [will] intervene "in instances where a party has engaged in such deceptive campaign practices as improperly involving the Board and its processes, or the use of forged documents which render the voters unable to recognize the propaganda for what it is."

*Midland Nat'l Life Ins. Co.*, 263 NLRB 127, 130 (1982) (quoting *Shopping Kart Food Market, Inc.*, 228 NLRB 1311, 1313(1977)); *see also Mitchellace, Inc. v. NLRB*, 90 F.3d 1150, 1155 (6th Cir.1996);

---

**2.** While the Company previously made a specific objection to this finding, it does not now single out the statement as an independent basis to justify a rerun election. Instead, the Company argues that Castro's statements, including the other alleged improprieties in the election, disturbed the necessary conditions for a fair election and cumulatively require that the results be set aside. As explained below, this Court will not overturn an election upon a claim that the cumulative effect of several matters mandates a new election when non of the matters alone would justify such relief.

*Van Dorn Plastic Mach. Co. v. NLRB,* 736 F.2d 343, 348 (6th Cir.1984).

This Court has generally endorsed the Board's treatment of misrepresentation claims as set forth in *Midland* but has not adopted the approach wholesale. The Court takes a more flexible tack and will set aside an election "where the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair choice will be affected." *Van Dorn,* 736 F.2d at 348.

■ Under either approach, Sliman has failed to offer sufficient evidence that Castro's statement, even if imprecise, was deceptive, pervasive or would tend to have a coercive impact on employee free choice. The Board's conclusion that the statement was mere campaign propaganda or otherwise non-material is supported by substantial evidence.

### 3. Electioneering During the Pre–Election Conference

The Board concluded that even if Castro displayed a sign reading "The Best Promises Are Made in Writing" to an employee in the parts department during the pre-election conference, such conduct was not objectionable, The Board based its conclusion on the fact that the alleged conduct did not occur in the designated "no-electioneering" area nor did it occur during polling time.

The Board does not prohibit all electioneering in the vicinity of the polling place on election day. *See Boston Insulated Wire & Cable Co.,* 259 NLRB 1118, 1118 (1982) ("[I]t is unrealistic to expect parties or employees to refrain totally from any and all types of electioneering in the vicinity of the polls."), *enforced,* 703 F.2d 876 (5th Cir.1983). The Board has established a *per se* rule that "sustained conversation with prospective voters waiting to cast their ballots, regardless of the content of the remarks exchanged, constitutes conduct which, in itself, necessitates a second election." *Milchem, Inc.,* 170 NLRB 362, 362 (1968). The Board considers the following factors:

[W]hether the conduct occurred within or near the polling place, but also the extent and nature of the alleged electioneering, and whether it is conducted by a party to the election or by employees. The Board has also relied on whether the electioneering is conducted within a designated "no electioneering" area or contrary to the instructions of the Board agent.

*Boston Insulated Wire & Cable Co.,* 259 NLRB at 1119 (finding no improper electioneering by union's agents).

This Court, like the Board, has concluded that conduct short of the type proscribed in *Milchem* requires a judgment "based on the facts and circumstances, whether the electioneering substantially impaired the exercise of free choice so as to require the holding of a new election." *Dayton Hudson Dep't Store Co. v. NLRB,* 987 F.2d 359, 364 (6th Cir.1993).

Here, the conduct at issue involved Castro leaving a pre-election conference in the polling area and entering the parts department where he stared at Mumford, a voting employee, without speaking, and "flashed" the back of a folder or clipboard that read: "The Best Promises Are Made in Writing." The conduct at issue took place outside the polling place and prior to the election. Mumford was not waiting in line to vote and no prolonged conversation took place. Accordingly, the *per se* proscriptions of *Milchem* do not apply.

■ Considering the facts and circumstances, the Board's conclusion that the electioneering did not substantially impair the exercise of free choice so as to require

the holding of a new election is reasonable and supported by substantial evidence. *See Dayton Hudson Dep't Store Co.,* 987 F.2d at 364. Electioneering outside of the polling area is frequently deemed unobjectionable. *See Boston Insulated Wire & Cable Co.,* 259 NLRB at 1119; *see also Duriron Co.,* 978 F.2d at 258. The Sliman facility did not contain a designated "no electioneering" area and the demonstration at issue here took place away from the polls. Castro's conduct with respect to Mumford was not particularly extensive or coercive. The alleged misconduct was not objectionable because the conduct at issue did not occur during the election or in the polling area, and Castro did not speak to any employees at all, much less those waiting in line to vote or voting.

## B. Emery's Conduct

In addition to the conduct addressed above with respect to dissemination of the letter to other employees reading "Written promises go further, Vote yes," the Company also asserts that Emery, acting as an agent for the Union, improperly defaced and removed the election notice on the morning of the representation election. The Company also asserts that Emery improperly yelled during the representation election to other employees to vote if they had not yet done so.

Initially, the Court must address whether Emery acted as the Union's agent. "Generally, a union is not responsible for the acts of an employee, unless the employee is an agent of the union." *Kitchen Fresh, Inc.,* 716 F.2d 351, 355 (6th Cir. 1983). The party seeking to prove agency "must show that the union 'instigated, authorized, solicited, ratified, condoned or adopted' the employee's actions or statements." *Id.* (citations omitted); *see also Kux Mfg. v. NLRB,* 890 F.2d 804, 809 (6th Cir.1989). Otherwise, an employee's con-

duct will only be attributed to the union if the company proves "that the union has clothed the employee with apparent authority to act on [its] behalf...." *Kitchen Fresh, Inc.,* 716 F.2d at 355. This requires proof that the union cloaked the employee with sufficient authority "to create a perception among the rank-and-file that the employee acts on behalf of the union and that the union did not repudiate the employee's statements or actions." *Id.* (citaions omitted).

The evidence demonstrates that Emery, while holding no formal position with the Union, was an active and vocal union supporter. This fact standing alone, however, does not demonstrate actual authority. *Kux Mfr.,* 890 F.2d at 809. Sliman contends that Castro, who was undisputably the Union's agent, asked Emery to show or distribute a pro-union letter to his fellow employees prior to the election. Castro denies this assertion, and claims that he simply asked Emery to dispose of the letter.

Sliman argues that a "special agency relationship" was created as a result of Castro's request that Emery show the letter. Sliman relies on cases that have found a special agency relationship when a union asks or permits employees to solicit signatures on union authorization cards and authorizes the employees to speak on that subject. In particular, these cases hold that:

[W]hen a union makes authorization cards available to employees with the understanding that they will solicit other employees to sign them, it thereby vests the solicitors with actual authority to obtain signed cards on its behalf. Additionally, when a union permits or acquiesces in employees' soliciting on its behalf without indicating to third parties that statements made by the card solicitors are not to be taken as the policies of

the Union, it thereby vests the solicitors with apparent authority to make the statements related to the subject matter of the cards. In both cases, whether by action or inaction, the union has created a special agency relationship for the limited purpose of card solicitation.

*NLRB v. Univ. Towers, Inc.*, 285 NLRB 199, 199 (1987).

■ Assuming Castro did so instruct Emery, which Castro disputes, his request suggests only that Emery was authorized by the Union simply to show or distribute the letter. This single instruction does not necessarily mean that the Union authorized Emery to speak generally or endorsed his statements. This evidence clearly does not support a finding that the Union held Emery out as a Union spokesman. *See Kux Mfg.*, 890 F.2d at 809 (distinguishing cases where employees were authorized to visit the homes of fellow employees, held out as union spokesmen, and given substantial responsibility as members of a pro-union committee composed of employees).

The Regional Director concluded that Sliman "has not established that Emery is an agent of the [Union] for conduct other than the solicitation of authorization cards." Although the Board majority "adhere[d] to [its] prior decision . . . adopting the Regional Director's finding," the majority also found, in agreement with the dissent, "that even assuming Emery was acting as a limited agent of the Union when he displayed the pro-union sign prior to the election, this conduct was not objectionable." This determination is supported by substantial evidence. There is no evidence that the letter influenced the votes of those employees or otherwise impacted the election in any way.[3] The Board correctly concluded that Emery did not engage in improper electioneering when he showed the letter to his fellow employees.

1. Defacement of Election Notice

The Board concluded that "[t]here was insufficient evidence that Emery or any other identifiable agent and/or supporter of the [Union] was involved in any way in the actual defacing of the Notice." Relying exclusively on Young's affidavit, Sliman argues that the Board erred in drawing this conclusion.

When assessing whether the defacement of a sample ballot justifies setting aside an election, the Board determines, first, whether the altered document on its face identifies the party responsible for its preparation and, second, if the source of the document is not clearly identified, whether the nature and contents of the material suggest that the document has the tendency to mislead the parties into

**3.** Sliman complains that the election should be reversed because Castro told Emery to lie if asked about showing the letter to the mechanics. Emery stated in his affidavit that "Miguel [Castro] told me to deny everything about me going around and showing the letter to the mechanics . . . even if I should have to go on stand in court, I should deny it." Castro denies the allegation.

Although Sliman raised the issue as an objection, the Board did not address it. The Board, and not this Court, should resolve all conflicts in the testimony of witnesses. Nonetheless, Sliman does not point to any evidence in the record to suggest that the comment had an impact on the outcome of the vote. Castro addressed the comment to Emery, who himself was the union's key employee organizer. As such, the statement on its face could not have coerced Emery to cast a prounion vote. Moreover, if the statement influenced Emery at all, it would have likely influenced him to change his mind and vote against the union, which in turn would not have affected the election outcome. While this Court condemns such conduct if it in fact occurred, it did not effect the election.

believing that the Board favors one party's cause. *See NLRB v. Hub Plastics, Inc.,* 52 F.3d 608, 613 (6th Cir.1995) (citing *SDC Invest., Inc.,* 274 NLRB 556, 557 (1985)).

■ Even assuming *arguendo* that Emery was acting as the Union's agent, Young's affidavit does not establish that Emery defaced the election notice. When Young entered the changing room to check the election notice, Emery was already there. Young, seeing the writing scrawled across the notice, asked who had defaced it. In response, Emery tore the election notice down. Thus, there is no evidence to demonstrate that Emery himself defaced the notice. In this case, the defacement was anonymous. *See Hub Plastics,* 52 F.3d at 613 (finding Board's conclusions reasonable that anonymous markings did not influence election when such markings were " 'clearly discernible' and sufficiently distinct from the Board's typewritten and printed notice so as to preclude any suggestion that the [marking] was inserted by the Board or that it supported the [Union] in the election.") Further, no evidence supports the assertion that any other employees saw the defaced notice or that it influenced their votes. *Id.* at 614. Accordingly, the Board's decision is supported by substantial evidence.

### 2. Tearing Down the Election Notice

The Board concluded that it was not improper for Emery to tear down the defaced election notice because the Board would expect that a defaced notice would be removed and replaced with a clean copy. Furthermore, the Board noted that all eligible employees voted which supports the conclusion that the Board's posting requirements were met, all employees were notified of their right to vote, and all exercised this right.

■ In the present case, the Board properly concluded that it was appropriate to remove a defaced election notice. *See McDonald Land & Mining Co.,* 301 NLRB at 470; *Fort Worth Steel & Mach. Co.,* 242 NLRB 917, 918 (1979). Generally, it is the responsibility of the company to remove the defaced notice. *See Fort Worth Steel & Mach.,* 242 NLRB at 918. It was not inappropriate for Emery, a Company employee, to remove the notice in the presence of Young, the Company employee charged with responsibility for monitoring the election notice. Young ultimately reported the defacement to Paul Sliman who replaced the defaced notice. The Board's finding was supported by substantial evidence and has a basis in law.

### 3. Encouragement to Vote During the Election

The Board found that Emery asked for a list of those employees who had voted and, when told he could not have the list, yelled to employees on the shop floor words to the effect of "Come in and vote if you haven't voted yet." The Board found Emery's conduct unobjectionable because "Emery did not make any specific campaign promises; did not address wages, hours, terms or conditions of employment, or other collective bargaining issues; did not refer in any way to the Employer; and his words did not contain specific appeals to vote in favor of the [Union.]." This conclusion is supported by substantial evidence in the record.

Although Sliman argues that Emery acted in direct contravention of the Board Agent's instructions, the evidence does not establish the Board Agent told Emery not to yell or encourage others to vote. Further, Emery's statement was neutral and therefore did not affect the results of the election or interfere with employee choice.

The Board does not prohibit all electioneering in the vicinity of the polling place

on election day. *See Boston Insulated Wire & Cable Co.,* 259 NLRB at 1118. The rule set out in *Milchem, Inc.,* 170 NLRB at 362, which requires a second election where "sustained conversation with prospective voters waiting to cast their ballots" takes place "regardless of the content of the remarks exchanged," applies only to parties to the election and their agents. *Overnite Transp. Co. v. NLRB,* 140 F.3d 259, 270 (6th Cir.1998). As the Ninth Circuit has explained, the Board cautioned that this rule " 'does not mean that any chance, isolated, innocuous comment' will void the election." *S. Pac. Furniture, Inc. v. NLRB,* 627 F.2d at 173, 175 (9th Cir.1980).

▮ Assuming *arguendo* that Emery acted as an agent of the Union, his conduct does not appear to fall within the *per se* rule of *Milchem.* His statement was not prolonged, not made in the polling area and not directed to employees waiting in line waiting to vote.

Because the *per se* rule of *Milchem* does not apply, the Court must make a determination based on the facts and circumstances, whether the electioneering substantially impaired the exercise of free choice so as to require a new election. *See Dayton Hudson Dep't Store Co.,* 987 F.2d at 364. To that end, *South Pacific Furniture* provides some guidance. There, the Ninth Circuit determined that a union observer's statement to employees to "Come on and vote, exercise your power" was essentially neutral and was not conversation, much less a sustained one. The court found "it hard to take seriously [the Company's] assertion that the statement ... was 'electioneering.'" *S. Pac. Furniture,* 627 F.2d at 175.

This conclusion is bolstered to the extent that Emery was a voting employee and not an agent of the Union. As such, Emery was not prohibited from carrying on conversations in the polling area. Conduct of non-agent, pro-union employees is objectionable only if it is so disruptive as to require setting aside the election. *Westwood Horizons Hotel,* 270 NLRB 802, 803 (1984); *Boston Insulated Wire & Cable Co.,* 259 NLRB at 1119 n. 11. Here, because there was no evidence of Union involvement in this conduct, the Board correctly applied the test of whether the "misconduct was so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible." This case does not involve and the facts do not support a conclusion that any significant disruption took place during the representation election. Nor does the record reflect any misconduct so aggravated as to create an atmosphere in which a free election was an impossibility. Thus, the Board's conclusion that his yelling during the election was unobjectionable because it was neutral and did not involve campaign issues is supported by substantial evidence.

### C. Cumulative Effect of Misconduct

Sliman argues that the cumulative effect of the various incidents warrants setting aside the election, especially in light of the closeness of the final results. The Regional Director and the Board did not address this issue.

This Court has rejected the notion that a cumulative-impact argument may be used to convert multiple non-meritorious claims into a substantial election challenge. When none of the company's objections has any merit under established legal standards, "[n]either singly nor in combination could the various incidents alleged have materially affected the employees' ability to express their free and fair choice." *Kux Mfg. Co.,* 890 F.2d at 811. This Court has refused to give weight to unmeritorious objections, no matter how numerous,

when the election was won by a narrow margin. *See NLRB v. Bostik Div., USM Corp.*, 517 F.2d 971, 975 n. 5 (6th Cir.1975).

None of the alleged wrongs in this case is substantial. Even considered with the other minor alleged wrongs, the cumulative, negative impact on the election at issue in this case was immaterial. Because the Court finds that none of the instances of alleged misconduct raised by Sliman had any impact on the free and fair choice of the employees, Sliman's cumulative impact argument is unavailing.

### IV.

For the foregoing reasons, the Court GRANTS the Board's Petition for Enforcement and AFFIRMS the Board's order directing Sliman to cease and desist refusing to bargain with the Union.