35 F.3d 256
 147 L.R.R.M. (BNA) 2275, 128 Lab.Cas. P 11,182
 KI (USA) CORPORATION, Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner,
International Union, United Automobile, Aerospace &
Agricultural Implement Workers of America, Intervenor.
 Nos. 93-5679, 93-5832.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 17, 1994.
Decided Sept. 14, 1994.
 
 Freddie B. Westfall, Jr., Huddleston, Bolen, Beatty, Porter & Copen, Huntington, WV, Richard C. Hotvedt, Morgan, Lewis & Bockius, Washington, DC (argued and briefed), for KI (USA) Corp.
 John C. Truesdale, Executive Secretary, N.L.R.B., Office of Gen. Counsel, Washington, DC, D. Randall Frye, Regional Director, Joseph C. Devine, N.L.R.B., Cincinnati, OH, Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Charles P. Donnelly, Jr. (briefed), Joseph E. Moore, Joseph E. Moore, John Arbab (briefed and argued), N.L.R.B., Washington, DC, for N.L.R.B.
 David W. Hupp, Irwin H. Cutler, Jr. (argued and briefed), Segal, Isenburg, Sales, Stewart, Cutler & Tillman, Louisville, KY, for Intern. Union, United Auto., Aerospace and Agr. Implement Workers of America, UAW.
 Before: KENNEDY and SILER, Circuit Judges; and BROWN, Senior Circuit Judge.
 BAILEY BROWN, Senior Circuit Judge.
 
 
 1
 KI USA Corporation (the Company) petitions to review an order of the National Labor Relations Board (the Board) requiring it to negotiate with the United Auto Workers Union (the Union) pursuant to an election and subsequent Board certification of the Union as the exclusive bargaining representative of the Company's Berea, Kentucky unit employees. The Company filed several Objections to the election results, a vote of 19-16 in favor of the Union, claiming in Objection No. 3 that the Union "improperly and unlawfully engaged in a pattern of making appeals to racial and national origin prejudice and issued false statements regarding the Employer's position on such matters."
 
 
 2
 A hearing was held concerning this Objection, and the Board's three-member panel adopted, with one dissenting vote by Member Raudabaugh, the hearing officer's conclusion that the Objection should be overruled. The Company then refused to bargain with the Union, leading to a complaint filed by the General Counsel of the NLRB (the General Counsel) and a Decision and Order of the Board requiring the Company to bargain with the Union. The Company now petitions our court to review the Board's decision to certify the Union; the General Counsel cross-petitions to enforce its collective bargaining order against the Company. We find that the Union did improperly appeal to racial prejudice during its election campaign and we therefore DENY the General Counsel's petition for enforcement of its collective bargaining order against the Company and overturn the certification of the Union as the bargaining representative at the Company's facility in Berea.
 
 I.
 
 3
 The Company is a wholly-owned subsidiary of a Japanese corporation engaged in the manufacture of automobile parts. It instituted in its Berea facility a Japanese-style management system, known as Kaizen, which required the use of Japanese employees in key management positions, but not in all such positions, at the Berea plant. The hearing officer found that an "apparent result" of this program was resentment by certain employees at the plant that "American managers had essentially a minor role and that the plant was run by the Japanese." In addition, there was evidence that two of the Company's African-American employees had shared for at least a year prior to the election a "private joke" about negative Japanese attitudes towards American employees, especially African-American ones, inspired by a newspaper article they had both read. The hearing officer also found that at least two other employees, both Union supporters, had expressed harshly negative attitudes during the campaign about the Japanese managers' "low opinion of American intelligence and workmanship" and how the Japanese were "screwing us [the American workers] over."
 
 
 4
 On March 21, 1991, the day before the plant election, the Union held a meeting attended by four employees and two Union representatives. At that meeting, there was a general discussion of Japanese attitudes toward Americans. At the end of the meeting, the Union organizers made available to the workers a letter to the editor (the Nakamura letter) from the January 1991 issue of Easy Rider magazine, in which a Japanese businessman expressed his very negative views regarding American workers. The Union had copied this letter for distribution, adding a heading in large bold letters stating that "YOU SHOULD KNOW" and also underlining certain parts of the letter.[1] There was no evidence that the Union organizers mentioned this letter during the meeting itself; however, it was placed on a table along with other materials and made available to the employees at the end of the March 21 meeting. There was also no evidence that Mr. Nakamura had any connection with the Company.
 
 
 5
 The hearing officer found that the letter was "reproduced and widely circulated among employees at the [Berea plant] on the evening before the date of the election as well as on the dayshift commencing at approximately 7 a.m., the day of the election." When the Company learned of the distribution of the Nakamura letter, it sought to reduce its negative impact by distributing, along with a cover letter of its own composition, a rebuttal letter from a different Japanese businessman, also printed in Easy Rider magazine, chastising Nakamura for his insensitivity and benighted views. The Company managed to prepare a few copies of its response by 12:30 p.m., but because the election was to be held at 3:00 p.m. on that day, March 22, the Company was only partially successful in making its response known to the Berea plant employees. The Company's position was that "it was out of time to make an effective response."
 
 II.
 
 6
 The dispositive issue on appeal is whether the Board abused its discretion in certifying the representation election and ordering the Company to bargain with the Union. Ordinarily, the party challenging a decision of the Board faces a heavy burden of proof:
 
 
 7
 The scope of our review of Board findings is well-established: Where there is substantial evidence in the record as a whole to support the Board's conclusions, they may not be disturbed upon appeal.... [T]he burden of proof on parties seeking to have a Board-supervised election set aside is a "heavy one."... [S]pecific evidence is required, showing not only that unlawful acts occurred, but also that they interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election.
 
 
 8
 Kux Mfg. Co. v. NLRB, 890 F.2d 804, 808 (6th Cir.1989) (citations and internal quotation marks omitted).
 
 
 9
 When appeals to racial prejudice are involved, however, the burden of proof shifts against the party using the racial message. See Sewell Mfg. Co., 138 N.L.R.B. 66 (1962). Sewell involved an employer's distribution of inflammatory material concerning the union's affinity for African-American organizations such as the NAACP, including a picture of a white man, identified as a union leader, dancing with a black woman. In setting aside the election that was influenced by such material, the Board stated:
 
 
 10
 So long, therefore, as a party limits itself to truthfully setting forth another party's position on matters of racial interest and does not deliberately seek to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals, we shall not set aside an election on this ground. However, the burden will be on the party making use of a racial message to establish that it was truthful and germane, and where there is doubt as to whether the total conduct of such party is within the described bounds, the doubt will be resolved against him.
 
 
 11
 Id. at 71-72 (footnote omitted) (second emphasis added). In NLRB v. Eurodrive, Inc., 724 F.2d 556 (6th Cir.1984), we noted that "an effective appeal to racial ... prejudice prima facie warrants setting aside an election." Id. at 558 (internal quotation marks omitted).
 
 III.
 
 12
 The Company argues that the use of the Nakamura letter was an unacceptable overreaction to employee concerns about racial matters. In Eurodrive, a union organizer had promised, on two separate occasions within eight days of the election, to force the reinstatement of a white employee who had been discharged for racial harassment of a black employee, using the incident as an example of the "white's need for protection." Eurodrive, 724 F.2d at 557. Recognizing that the policy of Sewell requires setting aside an election when the "only purpose for challenged conduct is to arouse the racial feelings of voters in an election," we stated the underlying principle of that policy to be "that members of one race should not be persuaded to vote for or against a union on the basis of invidious prejudices they might have against individuals of another race." Id. at 558 n. 4 (emphasis added) (internal quotation marks omitted). We found that the union organizer's statements, although "tangentially related to legitimate campaign issues ... placed undue emphasis on a racial issue[,]" id. at 559, and constituted "a subtle, but deliberate attempt to exacerbate racial feelings among the employees." Id. at 560. We also found that because the second statement was made on the eve of the election, "[t]he Company was ... powerless to respond to the remarks. Indeed, even if the Company had the opportunity to respond, to have done so may have further inflamed racial feelings." Id. This meant that the objectionable statements indeed had a "material effect" on the election. In conclusion, based upon the undisputed facts, we denied the NLRB's petition to enforce its order requiring the employer to bargain with the union. Id.
 
 
 13
 The General Counsel responds by pointing out that the Board "has made clear that not all references to racial issues will lead to invalidation of election results," for instance, when such references are "isolated remarks that do not represent a central theme of the election." The General Counsel notes the testimony of the Company's Human Resources Manager, Harry Billups, who stated in reference to the "violence aspect" that the Union's campaign at the Berea plant was "the cleanest campaign I've ever seen." The General Counsel further argues that the discreet manner in which the Nakamura letter was offered to the Company's employees qualifies under Coca-Cola Bottling Co., 232 N.L.R.B. 717 (1977), as the type of "temperate presentation" that does not violate Sewell, indicating that the Union's purpose was "informational, not exploitative." The General Counsel also notes that " '[t]he question of whether employees have been unfairly treated, for whatever reason, is always a legitimate topic of discussion in a union campaign.' " (quoting Coca-Cola/Dr. Pepper Bottling Co., 273 N.L.R.B. 444, 445 (1984)).
 
 IV.
 
 14
 Sewell requires that a party set forth truthfully another party's position on racial matters. The hearing officer in the instant case judged the truthfulness of the Nakamura letter by the standard for the truthfulness of campaign propaganda established in Midland Nat'l Life Ins. Co., 263 N.L.R.B. 127 (1982):
 
 
 15
 [W]e rule today that we will no longer probe into the truth or falsity of the parties' campaign statements, and that we will not set elections aside on the basis of misleading campaign statements. We will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is.... [W]e will [also] continue to protect against other campaign conduct, such as threats, promises, or the like, which interferes with employee free choice.
 
 
 16
 Midland, 263 N.L.R.B. at 133 (footnotes omitted) (emphasis added). In Dayton Hudson Dep't Store Co. v. NLRB, 987 F.2d 359 (6th Cir.1993), we stated our agreement "with the Board that it should not set aside an election on the basis of the substance of representations alone, but only on the deceptive manner in which representations are made." Id. at 365 (internal quotation marks omitted). Using this standard, the hearing officer found that the Union had not been untruthful in its presentation of the Nakamura letter, because it had neither forged nor altered the original (other than underlining certain parts of it) and because the Union had "clearly and concisely indicated" the letter's source.[2]
 
 
 17
 In our view, the Midland standard is the wrong one to apply to allegations of racial bias. When a party, as here, establishes a prima facie case that an election was unfair due to an "inflammatory appeal" to racial feelings, warranting a hearing, then the burden shifts to the party using the racial appeal to show that its remarks were "truthful and germane," i.e., that they truthfully represented the other party's position on racial matters; it is not enough to show that the racial propaganda was neither forged nor altered and that its source was clearly indicated. Because we find that Midland has not overruled sub silentio the Sewell requirement that a party truthfully represent another party's views on racial matters, we hold that the truthfulness of racially-related remarks is the type of "other campaign conduct" to which the lenient Midland standard of truthfulness, by its own terms, does not apply.[3]
 
 V.
 
 18
 Applying the proper truthfulness standard to the facts before us here, we agree with Member Raudabaugh's statement, in his dissent from the Board's certification decision, that "since there is no record evidence that the Employer in fact held anti-American views, the Union was not truthfully setting forth the Employer's position on these matters." In the proceedings below, the Company made a prima facie case that the Union unacceptably used an appeal to racial prejudice during its campaign. Under such circumstances, as Member Raudabaugh noted, the burden is on the Union "to establish that the message was truthful and germane." This is a burden that the Union did not meet. It was not shown that the Nakamura letter truthfully represented the Company's position on racial matters because no connection was shown between Mr. Nakamura and the Company's management. The letter is truthful only as regards Mr. Nakamura's views, but these are not germane to any campaign issue at the Company's facility. Given the circumstances of this case, especially in light of the short time available to the Company to respond to the Nakamura letter and the difficulty of responding to such attacks at all, we cannot allow the results of the Union's certification election to stand. The distribution of the Nakamura letter exceeds the bounds of "legitimate discussion" of potential problems arising from an employer's treatment of employees based upon racial differences. As Member Raudabaugh points out, the Union's "negative stereotyping of [the] Japanese .... has [no] legitimate place in a representation election conducted by th[e] Board."
 
 VI.
 
 19
 For the reasons stated above, we DENY the General Counsel's petition for enforcement of its order requiring the Company to bargain with the Union and overturn the certification of the Union as the bargaining representative at the Company's facility in Berea.
 
 
 
 [1]
 The underlined parts included such statements as:
 As a Japanese businessman and investor, I am appalled at the typical lazy, uneducated American worker I have to deal with in your country .... half-witted American managers .... how ignorant and weak you have become.
 
 
 [2]
 The hearing officer also found that the Company "had an opportunity to effectively respond and rebut the content of the Nakamura letter" but failed to do so. We consider this finding of the hearing officer to be clearly erroneous. In so holding, we express no opinion regarding how much time a party must be given, prior to election day, to respond to the type of campaign propaganda used here by the Union, or even whether any amount of time would be sufficient to correct the prejudicial effect of such material. Our holding is limited to the facts of this case, and we find here that the certification election was tainted by the last-minute, racially-inflammatory appeal used by the Union and that the decision by the Board to the contrary was clearly erroneous
 
 
 [3]
 It should be noted that the Board in Sewell, while setting aside the election in part because the employer had circulated non-forged but racially-charged copies of articles from such newspapers as the Militant Truth, reiterated its adherence to a precursor to the Midland standard whereby "[e]xaggerations, inaccuracies, partial truths, name-calling, and falsehoods, while not condoned, may be excused as legitimate propaganda, provided they are not so misleading as to prevent the exercise of a free choice by employees in the election of their bargaining representative." Sewell, 138 NLRB at 70 (internal quotation marks omitted)