**NOT RECOMMENDED FOR PUBLICATION**
File Name: 06a0826n.06
Filed: November 13, 2006

**Nos. 05-2378 and 05-2461**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,

    Petitioner,

v.

FAMILY FARE, INC., d/b/a GLEN'S
MARKET,

    Respondent.

_____/

ON APPEAL FROM THE NATIONAL
LABOR RELATIONS BOARD

---

**BEFORE:**     CLAY and SILER, Circuit Judges; and STAFFORD, District Judge.[*]

    **CLAY, Circuit Judge.** Petitioner, the National Labor Relations Board ("NLRB" or "the Board"), applies to this court seeking enforcement of a Board order which found Respondent, Family Fare, Inc., d/b/a Glen's Market ("Glen's Market"), to be engaging in unfair labor practices in violation of the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 158(a)(1) and (5),[1] by

---

    [*]The Honorable William H. Stafford, Jr., United States District Judge for the Northern District of Florida, sitting by designation.

    [1]29 U.S.C. § 158(a) provides in relevant part:

it shall be an unfair labor practice for an employer – (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . . (5) to refuse to bargain collectively with the representatives of his employees,

refusing to bargain with a union recently certified as the representative of a unit of Respondent's employees. Respondent cross-petitions requesting that this Court overturn the Board's denial of its objections to the election, as well as the Board's refusal to direct a new election.

For the reasons that follow, this Court **DENIES** Respondent's cross-petition for review, and **GRANTS** the Board's application for enforcement.

## BACKGROUND

### I.    Factual History

Respondent operates one of its fifty-six grocery stores in Oscada, Michigan ("Oscada store"). There are three levels of supervisory employees at the store. The top management level is that of store director, held by Karen Gonsler. The next level consists of assistant store directors.[2] The third level of supervisory employees are the department managers. There are ten departments and corresponding managers in the store: customer service, meat, deli, bakery, produce, grocery, night stock, dairy, general merchandising, and frozen. The department managers conduct bi-annual performance evaluations of the hourly employees working in their departments. The store director then reviews these performance evaluations, using them to determine wage increases.[3]

subject to the provisions of section 159(a) of this title.

[2]Although the store had three assistant store directors in November 2001, Petitioner and Respondent agree that the Oscada store employed only one assistant store director as of January 2002, when the election at issue occurred.

[3]The Regional Director primarily relied upon the department managers' involvement in performance evaluations to conclude that they were "supervisors" as defined in the Act. Additionally, the Regional Director found that while department managers have some involvement in scheduling employees, granting leave requests, responding to grievances, and routine direction of employees, they operate "within relatively fixed parameters" and with insufficient discretion to

Vicki Doran, the deli department manager, initiated a union organizing campaign at the Oscada store in mid-October 2001 with the assistance of the bakery department manager, Matt Kovachevich. Respondent expressly opposed the union campaign. The first union meeting was held at Doran's house on October 19, 2001. At that meeting, Doran and others explained the advantages of the union, including higher wages and better benefits. Doran also told the attendees at the meeting that unionization of the store might result in the termination of the store director, Karen Gonsler.

The record shows that prior to the election, Doran and Kovachevich engaged in prounion activities. In October 2001, Doran approached employee, Gail Davis, asked her to fill out a union card, and gave Davis additional cards to distribute. Davis said that Doran talked to her and other employees in the coffee shop where the employees took their breaks. Davis testified that Doran spoke about the union so frequently that she and other employees wanted to avoid the discussion and took their breaks elsewhere. Doran also gave union authorization cards to dairy manager, Doug Witkovsky, who in turn returned signed cards to Doran. Witkovsky testified that Doran called him at home during the early days of the campaign to encourage him to join the organizing committee and to discuss the union. Another employee, Judy Howey, also testified that Doran called her at home in October to inform her about the organizing campaign, and a week later, Doran visited Howey's home to ask her to sign a union card and to tell her about the benefits of the union.

Carolyn Toppi, store produce manager, testified that Kovachevich asked her how she planned on voting and requested that she stay with the union, but she refused. According to Toppi, Kovachevich stopped speaking to her after she told him she did not support the union. Both Doran

support a finding of supervisory status on those grounds alone. (J.A. at 79-81)

and Kovachevich testified that they did engage in union campaign activities. None of the employees who testified at the hearing before the hearing officer worked in Doran or Kovachevich's departments. Moreover, none of the testifying employees who declined to sign union authorization cards reported negative repercussions as a result of their decisions.

During the run-up to the election, Respondent and its parent company, Spartan Stores, Inc. ("Spartan"), issued several letters to employees and held mandatory meetings aimed at discouraging employees from voting for the union. On December 20, 2001, Spartan issued a memo informing employees of the decision to exclude the customer service, meat, deli, bakery, and produce managers from the eligible voting unit. It expressly cautioned that these managers could no longer "[a]ttend union meetings, [i]nterrogate associates regarding union representation, [or m]ake any promises or threats to associates related to union activity." (J.A. at 252)

The Board conducted the secret ballot election on January 18, 2002. There were twenty-eight votes for the union and twenty votes against it. Eight challenged ballots were cast. The union was certified on February 22, 2005, as the exclusive collective bargaining unit of the relevant employees, which included all clerks, cashiers, meat cutters, department specialists, and courtesy clerks. Excluded from representation were the store director, assistant store director, customer services manager, meat manager, deli manager, bakery manager, produce manager, managers in training, seasonal employees, guards and supervisors.

## II.    Procedural History

On November 7, 2001, Local 876, United Food and Commercial Workers International Union, AFL-CIO ("the Union"), filed a petition with the NLRB seeking to represent a unit of

employees in the Oscada store. On November 26, 2001, prior to the election, an NLRB hearing officer conducted a hearing to consider the supervisory status of seven of Respondent's department managers. Respondent contended that the managers were supervisors within the meaning of the Act[4], and were therefore ineligible to vote. On December 19, 2001, the Board's Regional Director issued his Decision and Direction of Election, in which he found that five of the managers at issue were in fact supervisors, including the two department managers at issue in this case, deli department manager, Vicki Doran ("Doran"), and bakery manager, Matt Kovachevich ("Kovachevich").

The Union filed a request for review of the Regional Director's decision, which Respondent opposed. The Board issued an order denying the review, but permitted the five managers to vote in the election subject to challenge. Following the election, Respondent filed timely objections, alleging that the prounion activities of Doran and Kovachevich prior to the election had interfered with the employees' free choice in the election. On March 8, 2002, the Board issued a notice of hearing to resolve the issues raised by Respondent's objections and referred the matter to a hearing officer for Report and Recommendation.

---

[4]The Act defines a "supervisor" as:

> [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

At the hearing on March 18 and 19, 2002, the parties stipulated, for purposes of resolving the proceeding, that Bob Erwin, whose ballot was challenged, was ineligible to vote in the election and that the challenge to his ballot should be sustained. This rendered the remaining ballots "non-determinative insofar as they [were] insufficient in number to affect the results of the election." (J.A. at 168) The hearing officer recommended overruling Respondent's objections in their entirety, finding that there was "no need to revisit the supervisory issue."[5] (J.A. at 171, 172)

On June 3, 2002, Respondent filed exceptions to the hearing officer's Report and Recommendation challenging, *inter alia*, the hearing officer's conclusions that the supervisory union campaigning was not inherently coercive and did not constitute offerings of rewards. The Board filed its response to Respondent's exceptions on June 10, 2002. Subsequently, on February 22, 2005, the Board issued its Decision and Certification of Representative in which it adopted the hearing officer's recommendation and found that a certification of representative should be issued.

The General Counsel for the Union filed an unfair labor practices complaint before the NLRB on April 5, 2005, alleging that Respondent had violated 29 U.S.C. §§ 158(a)(1) and (5) by refusing the Union's request to bargain. Respondent answered. The Union filed a motion for partial summary judgment on May 5, 2005. On May 9, 2005, the regional office of the NLRB issued an order transferring the proceeding to the Board and a notice to show cause why the motion should not be granted, to which Respondent replied.

---

[5]In analyzing Respondent's objection involving supervisory campaign involvement, the hearing officer relied upon the Regional Director's previous finding that "Doran and Kovachevich are statutory supervisors as defined in the Act." (J.A. at 171.)

On June 10, 2005, the Board found that Respondent's refusal to bargain was an unfair labor practice under §§ 158(a)(1) and (5), and directed Respondent to bargain with the Union. On October 13, 2005, the Board filed an application for enforcement of its order against Respondent[6]. On November 1, 2005, Respondent filed its response and a cross-petition to review the Board's June 10, 2005 order.

## DISCUSSION

### SUBSTANTIAL EVIDENCE ON THE RECORD SUPPORTS THE BOARD'S DECISION TO OVERRULE RESPONDENT'S ELECTION OBJECTIONS IN WHICH RESPONDENT ALLEGED, INTER ALIA, THAT IMPROPER PROUNION SUPERVISORY CONDUCT TAINTED THE ELECTION

A.      **Standard of Review**

This Court's scope of review of Board findings is well-established. *Kux Mfg. Co. v. N.L.R.B.*, 890 F.2d 804, 808 (6th Cir. 1989). The Court reviews the Board's factual findings and application of law under the substantial evidence standard[7]. *Id.; N.L.R.B. v. St. Francis Healthcare Ctr.*, 212 F.3d 945, 952 (6th Cir. 2000). "Where there is substantial evidence in the record as a whole to support the Board's conclusions, they may not be disturbed upon appeal." *Kux Mfg. Co.*,

---

[6]This Court has jurisdiction over this petition for enforcement pursuant to 29 U.S.C. § 160 (e), which provides in relevant part:

> The Board shall have power to petition any court of appeals . . . wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and . . . the court . . . shall have jurisdiction of the proceeding, and of the question determined therein . . . .

[7]The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. 29 U.S.C. § 160(e).

890 F.2d at 808 (citations omitted). "The burden of proof on parties seeking to have a Board-supervised election set aside is a heavy one . . . . An objecting party must show by specific evidence not only that the improper conduct occurred, but also that it interfered with the employees' exercise of free choice . . . ." *Werthan Packaging, Inc.*, 345 N.L.R.B. No. 30, 2005 WL 2094924, at *3 (2005) (citations and quotations omitted). An objecting party cannot satisfy the burden by merely showing that an election "f[e]ll short of perfection." *N.L.R.B. v. Duriron Co.*, 978 F.2d 254, 256 (6th Cir. 1992). "This burden is not met by proof of misconduct, but rather, specific evidence is required, showing not only that unlawful acts occurred, but also that they interfered with the employees' free choice to such an extent that they materially affected the results of the election." *Kux Mfg.*, 890 F.2d at 808 (internal citations and quotations omitted). "The Board has broad discretion to determine whether the circumstances of an election have allowed the employees to exercise free choice in deciding whether to be represented by a union." *Duriron*, 978 F.2d at 256-57.

## B.    Objectionable Conduct

Substantial evidence supports the Board's conclusion that Respondent's supervisors did not engage in objectionable prounion conduct sufficient to taint the election process. In *Harborside Heathcare, Inc.*, 343 N.L.R.B. No. 100, 2004 WL 2915828 (2004), the Board clarified the legal standards applicable when an employer challenges the results of an election alleging objectionable prounion conduct. Under *Harborside*, the Board must consider two factors:

> (1) Whether the supervisor's prounion conduct reasonably tended to coerce or interfere with the employees' exercise of free choice in the election. This inquiry includes: (a) consideration of the nature and degree of supervisory authority possessed by those who engage in the prounion conduct; and (b) an examination of the nature, extent, and context of the conduct in question. (2) Whether the conduct interfered with freedom of choice to the extent that it materially affected the outcome

of the election, based on factors such as (a) the margin of victory in the election; (b) whether the conduct at issue was widespread or isolated; (c) the timing of the conduct; (d) the extent to which the conduct became known; and (e) the lingering effect of the conduct.

*Id*. at *6. According to the Board, "an express promise or threat is not a requirement for finding prounion supervisory conduct objectionable." *Id*. Nevertheless, the *Harborside* inquiry seeks to foreclose conduct – however implicit or subtly framed – that, in the aggregate, pressures employees to support or oppose unions out of fear of retaliation or hope for preferential treatment by the supervisor. *Id*. at *2 ("Whenever a supervisor engages in prounion or antiunion activities directed at employees he or she supervises, the potential exists for these activities to put pressure on employees, who are unlikely to forget the power the supervisor has over their work life."). Under *Harborside*, objectionable conduct includes both "actual threats" and "implied threats of retaliation." *Id.* at *6. The Board looks to "the conduct and speech of the supervisor" to determine whether, as a whole, it "amount[s] to implicit threats or coercion." *Id.* Nevertheless, some showing of coercion is required to sustain a finding of objectionable conduct. *Compare Millard Refrigerated Servs.*, 345 N.L.R.B. No. 95, 2005 WL 2477120, at *4 (2005) (finding objectionable conduct where several supervisors solicited union cards from employees, including those directly on their crew; one supervisor told employees "if the union does not get in, everybody will probably be fired" and that same supervisor told the group he would "make [their lives] a living hell" if they didn't support the union) *with Werthan Packaging*, 345 N.L.R.B. No. 30, 2005 WL 2094924, at *2 (finding no objectionable conduct where a supervisor approached an employee wearing a prounion button, asked her how she intended to vote and whether she had filled out an authorization card, and told the employee it would be in the best interest of her family to vote 'no').

*Harborside* dealt with the allegedly objectionable prounion conduct of a charge nurse, Robin Thomas ("Thomas"), at a nursing home. 343 N.L.R.B. No. 100, 2004 WL 2915828, at *3. Thomas engaged in intimidating and threatening behavior, including ordering a subordinate employee to attend meetings, threatening that the employee would lose her job if she did not vote for the union because the employee had signed an authorization card, repeatedly harassing the employee about not attending meetings, and threatening the employee two days before the election that her "days here are numbered if this union doesn't get in, tell your coworkers they need to vote for the union!" *Id.* at *3-4. Thomas also had threatening and intimidating conversations with other employees in which she repeatedly referenced their job security and threatened that they could lose their jobs if they voted against the union. *Id* at *3. Additionally, Thomas pressured at least one employee into wearing a union pin. *Id.* at *4. The pervasiveness and intensity of the supervisor's interactions with one employee were such that the employee filed a grievance against the supervisor, alleging that the supervisor "continuously harassed her about supporting the Union." *Id.* at *9.

The *Harborside* Board concluded that Thomas' "supervisory prounion conduct . . . was objectionable in that it interfered with the employees' freedom of choice so as to materially affect the election outcome." *Id.* at *2. According to the Board, Thomas's ability to reward and retaliate against employees, coupled with her repeated and confrontational references to job loss, "could reasonably lead [the employees] to believe that she was not merely expressing her personal opinion, but predicting a real prospect that they could lose their jobs." *Id.* at *8. In other words, given Thomas's status, "the employees could reasonably conclude that [she] had the ability to affect their job tenure if the Union lost the election." *Id.*

10

The Board in *Harborside* further held that "absent mitigating circumstances, supervisory solicitation of an [union] authorization card has an inherent tendency to interfere with the employee's freedom to choose to sign a card or not," and that such supervisory solicitation "may be objectionable." *Id*. at *9. *Harborside* strongly suggests that the Board, in applying this holding, may appropriately consider the extent of the supervisor's power over his subordinates, and that supervisory solicitation is inherently coercive only where the supervisors at issue possess some minimal quanta of authority and discretion. *Id.* at *10 ("[O]ur concern is that, if the[] people [soliciting] are supervisors, the interference with employee free choice emanates from their supervisory authority . . . ."); *see also id.* (finding supervisory solicitation of authorization cards objectionable in part "because of the power of the supervisor over an employee"). The Board's subsequent application of *Harborside* further supports this proposition.[8] In effect, the inquiry into the nature and extent of supervisory authority underlies the Board's decisions that supervisory solicitation of authorization cards constitutes inherently coercive conduct. Notably, the Board in *Millard Refrigerated Services* distinguished the Board's decision in the instant case on this very basis. 345 N.L.R.B. No. 95, 2005 WL 2477120, at *5 ("[I]n *Glen's Market*, the supervisors' authority was limited, the Board relying solely on participation in the evaluation process to establish

---

[8] *See Millard Refrigerated Services*, 345 N.L.R.B. No. 95, 2005 WL 2477120, at *4 (2005) ("Given the broad authority that the involved supervisors had over the solicited employees, and in the absence of mitigating circumstances, we concluded that, under the first prong of *Harborside*, the supervisors' card solicitation is objectionable."); *Chinese Daily News and Commc'n Workers of America, AFL-CIO*, 344 N.L.R.B. No. 132, 2005 WL 1564871, at *3 (2005) ("We find, based on the nature and extent of Lin's supervisory authority and the nature, extent, and context of his conduct . . . , that Lin's solicitation and collection of authorization cards from the . . . employees whom he supervised was inherently coercive.").

supervisory status; whereas here, there was 'overwhelming' evidence that the leads possessed a wide range of supervisory authority . . . ."). Applying *Harborside* and its progeny to the case at hand, this Court concludes that substantial evidence supports the Board's conclusion that the prounion supervisory conduct here did not reasonably tend to interfere with the employees' exercise of free choice and, consequently, does not rise to the level of objectionable.

1.   *Whether the Supervisors' Conduct Reasonably Tended to Coerce or Interfere with the Employees' Exercise of Free Choice*

The first *Harborside* factor directs this Court to consider whether the supervisors' conduct reasonably tended to coerce or interfere with the employees' exercise of free choice in the election. *Harborside*, 343 N.L.R.B. No. 100, 2004 WL 2915828, at *7. Subsumed within this inquiry, this Court must consider both "the nature and degree of supervisory authority possessed" by the individuals at issue and the "nature, extent, and context" of their allegedly objectionable conduct. *Id.* at *6.

a.   <u>*Nature and Degree of Supervisory Authority*</u>

In this case, the Board relied on the Regional Director's previous determination that department managers Doran and Kovachevich were statutory supervisors under the Act, finding it unnecessary to further examine the issue. Substantial evidence on the record supports the Regional Director's finding. However, like all department managers at Respondent's store, Doran and Kovachevich were low-level supervisory employees and did not possess significant supervisory authority.

The charge nurse in *Harborside* had broad authority to finally and substantially impact the daily work life of her subordinates.[9] Unlike the rather sweeping and unchecked supervisory authority reposed in the charge nurse in *Harborside*, the department managers here exercise limited authority. They had little ability to exercise independent judgment; rather, they participated in supervisory tasks subject to the direction and review of the store director and any assistant store directors. For example, the Regional Director found that, while department managers created the initial weekly schedule for employees in their department, the store director reviewed and often modified those schedules. Moreover, while the department managers had some role to play in employee discipline, the store director became heavily involved in deciding whether significant disciplinary action, such as discharge or suspension, was warranted. In their most significant supervisory task – conducting performance evaluations – the department managers' input largely determined employee eligibility for a wage increase.[10] Such evaluations occurred at the third and sixth month for new employees, and every six months thereafter. Consequently, Doran and Kovachevich, although properly classed

---

[9]The *Harborside* Board found that she:

> had the authority to initiate disciplinary action[,] . . . direct nurses, assign nurses' schedules, make independent judgments, interview and recommend prospective employees, give the principal input on nursing assistants' evaluations (which affect retention and pay raises), immediately suspend and send home employees, request employees to stay over, and recommend suspension and termination of employees.

*Harborside*, 343 N.L.R.B. No. 100, 2004 WL 2915828, at *4.

[10]The Regional Director concluded on this narrow basis that department managers at Respondent's store are, in fact, statutory supervisors under the Act.

13

as statutory supervisors, had little authority to impact the daily work lives of employees in their respective departments.

Furthermore, the record establishes that neither Doran nor Kovachevich exercised actual supervisory authority over the employees identified as persons that they directly approached about the union and union authorization cards.[11] Under *Millard*, prounion supervisory conduct need not be targeted toward a direct subordinate to be objectionable where a group of prounion supervisors work together. 345 N.L.R.B. No. 95, 2005 WL 2477120, at *4. However, in this case, the record does not show that Doran and Kovachevich were working together and targeting each other's supervisees. Consequently, this Court agrees with the Board that "the lack of evidence that Doran and Kovachevich had supervisory authority over the employees toward whom their conduct was directed" supports a finding of nonobjectionable conduct in this case. (J.A. at 8)

b. *Nature, Extent, and Context of the Conduct*

Doran and Kovachevich's conduct did not rise to the level of coercive, nor did it interfere with free choice in the election. First, their conduct was not of the frequency and intensity of that found objectionable in *Harborside* and its progeny. *Compare Harborside*, 343 N.L.R.B. No. 100, 2004 WL 2915828, at * 9, *with Werthan*, 345 N.L.R.B. No. 30, 2005 WL 2094924, at * 3. Although Doran initiated the union campaign, and spent substantial time trying to recruit people to be involved in organizing and leading the campaign, the record does not reflect that Doran pressured the

---

[11]In fact, of the four employees who testified at the hearing on the election challenge, at least three held supervisory positions arguably on par with Doran and Kovachevich: Carolyn Toppi, the produce manager; Judy Howey, the assistant customer service manager; and Doug Witkovsky, the dairy manager.

employees – implicitly or otherwise – to support the union. Even if they spoke frequently about the union, there is no evidence that they were putting undue pressure on other employees to join, or that they were engaging in threatening, harassing, or intimidating behavior.[12] Furthermore, the evidence does not suggest that they promised any rewards or implied that rewards would be forthcoming if employees supported the union.

Second, it cannot be said that Doran and Kovachevich engaged in inherently coercive conduct when they solicited employees to sign authorization cards and gave out stacks of cards for others to distribute. Under *Harborside*, supervisory solicitation of authorization cards constitutes inherently coercive conduct only where the supervisors at issue possess sufficiently broad and meaningful authority. *See Harborside*, 343 N.L.R.B. No. 100, 2004 WL 2915828, at *10; *see also Millard*, 345 N.L.R.B. No. 95, 2005 WL 2477120, at *4; *Chinese Daily News*, 344 N.L.R.B. No. 132, 2005 WL 1564871, at *3. As the Board's findings suggest, the department managers at Respondent's store exercise only limited supervisory authority within well-defined parameters and, often, subject to the final judgment of the store director. Where statutory supervisors do not actually exercise power over the solicited employee, such solicitation does not rise to the level of inherently coercive conduct. Further, in this case, Respondent's full-scale antiunion campaign and the ultimate

---

[12]*Cf. Harborside*, 343 N.L.R.B. No. 100, 2004 WL 2915828, at *8-9 (finding the charge nurse "repeatedly threatened employees with the prospect of job loss" and engaged in "continuous, pervasive, and aggressive campaigning . . . , which included soliciting employees' signatures on authorization cards"); *Millard*, 345 N.L.R.B. No. 95, 2005 WL 2477120, at *4 (noting, among other things, that one supervisor told his subordinates that if they did not vote for the union, he would "make [their lives] a living hell"); *Chinese Daily News*, 344 N.L.R.B. No. 132, 2005 WL 1564871, at *2 (finding the supervisor distributed authorization cards and "personally watched while seven of his supervisees signed" them).

exclusion of Doran and Kovachevich from participation in the campaign[13] mitigate any likelihood that the supervisors' solicitation had any impact – however small – on the decision-making process of the solicited employees.

Substantial evidence supports the hearing officer's analysis of the first factor. As stated by the hearing officer, "[w]hile it is clear that there was supervisory involvement in support of the union's organizational drive, there is absolutely no record evidence of supervisory coercion or the offering of rewards by Doran or Kovachevich, or any supervisor." (J.A. at 171) Moreover, while Doran and Kovachevich "may have talked about what the union may be able to do if the employees selected it as their exclusive collective bargaining representative . . . that is nothing more than campaign rhetoric and does not constitute the offering of rewards by the supervisors in exchange for support." (J.A. at 171-72) Although "an express promise or threat is not a requirement for finding prounion supervisory conduct objectionable," *Harborside*, 343 N.L.R.B. No. 100, 2004 WL 2915828, at * 6, at a minimum, implied threats or coercion must be shown to establish supervisory misconduct. *Id*. ("Evidence of actual threats are [sic] not required; implied threats of retaliation are sufficient.") (internal citations and quotations omitted). Mere supervisory participation in the initial organizing campaign without more does not suffice. Consequently, substantial evidence supports the Board's finding that Doran and Kovachevich's prounion activity did not impact the employees' free choice in the election.

---

[13]Respondent succeeded in having Doran and Kovachevich, along with certain other managers, excluded from participation in the campaign. Respondent also ensured that all eligible employees were on notice as of December 2001 – prior to the vote – that Doran and Kovachevich could no longer attend union meetings or even discuss the union with non-managerial employees, much less impact the employees' decisions to support or oppose the union.

2.    *Whether the Conduct Interfered to the Extent that it Materially Affected the Outcome of the Election*

As to the second *Harborside* factor, the Board did not reach the issue of whether the supervisors' conduct interfered with freedom of choice to the extent that it materially affected the outcome of the election.  In fact, the Board found it unnecessary to answer the question since it did not view the supervisor's conduct as coercive or as having interfered with the employees' exercise of free choice in the election.   Like the Board, this Court finds it unnecessary to reach the second *Harborside* factor.

**CONCLUSION**

Substantial evidence supports the Board's decision to deny Respondent's election objections, and therefore we **DENY** Respondent's cross-petition for review, and **GRANT** the Board's application for enforcement of its June 10, 2005 order directing Respondent to bargain with the union.